Stanley Gartenstein, J.
“ I am invisible man. No, I am not a spook like those who haunted Edgar Allan Poe * * * I am invisible, understand, simply because people refuse to see me * * * When they approach me they see only my surroundings, themselves, or figments of their imagination * * * anything except me. It is * * # often * * * wearing on the nerves * * * you doubt if you really exist * * * It’s when you feel'like this that * * * you ache with the need to convince yourself that you do exist in the real world * * * and you strike out with your fists, you curse, and you swear to make them recognize you. And, alas, it’s seldom successful.” (From Invisible Man by Ralph Ellison.) (Copyright 1947, 1952 .by Ralph Ellison. Reprinted by permission of Random House, Inc.)
Perhaps a history of our time will someday define the function of the law and its courts as the intervener between an individual struggling to be recognized as human and the vast bureaucracy which tends to dehumanize him.
Bureaucracy and red tape have a way of feeding on themselves. When they trap a human being, he is categorized; placed on the assembly line; labeled, packaged and delivered at the end of this treadmill wholly anesthetized as a neat stack of reports, each of which has picked up its requisite complement of marginal initials on the way. When the frustration becomes intolerable, this human being is often impelled to perform some act affirming that he is in fact alive and unique. In his rage, *852 the delinquent youth who is promised but receives no treatment might well become the misfit of tomorrow. It is tragic enough that society’s insoluble problems contribute to this process. But it is criminal when we are given a chance to intervene and let it pass us by. The court is here given this opportunity, indeed, the positive statutory duty to do so.. In the light of the unsatisfactory choice of dispositional alternatives which society at large has made available to this court, a condition for which society has the temerity to blame the court itself, it will not allow this opportunity to slip through its fingers.
the pacts :
Carlos is before the court for disposition in two delinquency proceedings in which substantially similar allegations of criminal mischief and burglary were established and findings made. He was on remand (secure detention) from January 25 to April 16, 1974, when he was paroled to his mother. His family is known to this court; his mother was herself a respondent-in prior separate, proceedings in which Carlos was adjudicated a neglected child. Considering the family background of criminal and delinquent behavior involving other siblings, it is reasonable to conclude that Carlos never had a chance to “ make it ” in his surroundings.
In the midst of this classic cycle of poverty, neglect and delinquency, one social worker, Sister Lillian of his neighborhood parish, took Carlos under her wing and motivated within him a thirst for education and development of his capacities, which appear to be in the manual arts. At one hearing, Carlos’ attorney brought into the courtroom beautiful, creative examples of his handiwork. The boy’s talents appear to be ideally suited for development at a vocational high school, in this instance, East New York Vocational High School, located within reasonable proximity of his home. Carlos is now out of school and using every effort of his own and Sister Lillian’s to enroll. Admission tó this school has been denied him because he was at Spofford on remand by court order when the deadline for applications came and went. A short history of his frustrations and the endless referral from one office to another, to no avail, has been supplied by Sister Lillian and is part ,of the probation record.
JOINDER OF BOARD OF EDUCATION:
The dispositional hearing was scheduled for May 10, 1974 at which time, the court, hearing of the refusal of the school to *853 admit Carlos, issued process joining the principal of the school and the board of education as parties. Counsel for the board and the principal appeared at the next hearing pursuant to court mandate and although objecting to their being joined as parties, nevertheless demanded a hearing proffered by the court as to whether or not an order pursuant to section 255 of the Family Court Act directing Carlos’s admission would be in his best interests. Upon specific admonition by the court that an objection to being so joined was inconsistent with the hearing on the merits so proffered and accepted, the board nevertheless elected to proceed on the merits. The hearing was set at the mutual convenience of counsel and the parties. When it was reached, the board appeared and waived it, now framing its objection on the sole ground that section 255 as amended in 1972 dealt only with neglect and abuse proceedings under article 10 of the act and did not authorize any order against the board of education. Despite the fact that it elected not to participate in the hearing granted at its request, it again took the contradictory stance of objecting to the consideration of certain dispositional material; then, a third time, took the inconsistent stance of accepting the court’s offer to examne these reports and comment upon them. The board is thus estopped not once, but three times. The court holds jurisdiction over it perfected.
. Before examining section 255 of the Family Court Act, certain background perspectives must be considered.
JUDICIAL CONFERENCE REPORT:
The problems Carlos faces are far from unique. An eloquent plea for the services which the legislative and executive branches have not provided was made in October, 1973 by the Office of Children’s Services of the Judicial Conference in a report entitled Juvenile Injustice. In a study of dispositional alternatives for juveniles before the court, statistics showed that: a) Only 21% came from intact families, b) 87% were in the 13- to 16-year-old category, traditionally the most difficult to place, c) 73% were school truants, d) 59% were on welfare, e) 31% had other siblings before the court.
As a result thereof and because of the lack of adequate facilities, the court was unable to follow the recommendations of psychologists, psychiatrists and probation officers in a considerable majority of the cases surveyed.
The report, in large measure, blamed the failure to move ahead vis-a-vis solutions to these problems on (p. 74) “ the fragmented and compartmentalized delivery of service systems *854 that allow each department and agency to say ‘ let someone else provide for the child ’ ”,
The school in question, and the board by backing the school’s position, now say the same thing about this boy. But Carlos is not a commercial commodity or fungible goods and this school is where he belongs.
section 255:
The Legislature’s answer to the deplorable situation later cited by the Office of Children’s Services was the amendment of section 255 of the Family Court Act, enacted during a time of growing recognition that this court, charged with the responsibility of intervention in people’s lives, was consistently denied facilities giving it any meaningful alternatives. At a time when the law mandated treatment (see Rouse v. Cameron, 373 F. 2d 451; Wyatt v. Stickney, 325 F. Supp. 781; Sas v. Maryland, 334 F. 2d 506) society provided hone. The very reason for the existence of this court as a separate entity — that of providing services — was too often illusory. Even the United States Supreme Court has warned that, failing some unique service to be made available in this court, the noble social experiment which was its genesis might very well be discontinued.. (See McKeiver v. Pennsylvania, 403 U. S. 528, 551.)
The new import of section 255, its former terms as against its present ones, may be understood by tracing the history of Matter of Walker v. Foster (69 Misc 2d 400) the case pending at the time of amendment. In that matter, the court was presented with a neglect petition based upon a purported failure of the respondent parents to effectuate attendance of their two daughters in a school where they were beaten. The local school board authorized, then withdrew approval for them to attend a school almost equidistant from their home where they were not beaten. The neglect proceeding was dismissed. The court, concluding that red tape and bureacracy were responsible for the arbitrary refusal to permit attendance at the second school, ordered transfer of the girls. An appeal to the Appellate Division, Second Department (Matter of Naima C., 39 A D 2d 964) reversed the Family Court on the grounds that it had assumed jurisdiction to act, without statutory authority to do so, with the prerogatives of the Supreme Court under CPLR article 78 (see Matter of Naima C., 39 A D 2d 964). At the time this matter reached the Second Department, section 255 read as follows: “It is hereby made the duty of every county and municipal officer and employee to render such assistance and *855 cooperation as shall be within his jurisdictional power, to further the objects of this act.”
Almost simultaneous with the reversal of Naima C., the statute was amended to read (added words in italics): “ It is hereby made the duty of, and the family court or a judge thereof may order, any state, county, and municipal officer and employee to render such assistance and cooperation as shall be within his legal authority, as may he required, to further the objects of this act.”
Decisions have since appeared framed under the amended statute, all on the Family Court level; for whatever strategic reasons known only to the agencies involved, these were never appealed. This failure to appeal has served the purpose of allowing a fresh claim by different agencies — and sometimes by the very same one — that by some mystique only they comprehend, this section does not apply to them. The board has finally committed itself to taking an appeal herein should an order issue. This new attitude is most commendable.
A summary of prior decisions in this court is unnecessary. Suffice it to say, the stance taken herein by the court agrees with them.
The only post -Naima matter to reach the Appellate Division did so in the Fourth Department on appeal from the Supreme Court of Erie County (Usen v. Sipprell, 41 A D 2d 251). While this decision is of great value, it must be considered in light of the fact that: (a) the appeal was not from an order of the Family Court; and (b) that it centered around relief granted under CPLR article 78 and not' section 255. The Fourth Department reversal of the Supreme Court was based upon the existance of the amended section 255, however, and while not binding specifically as an Appellate Division level construction of section 255, it is certainly of greater weight than bald obiter dictum and highly persuasive in this Department. Microscopic examination of Usen therefore must certainly shed light on how this department might incline.
The first proposition established by the Fourth Department in a closely reasoned syllogism may be found in the reversal of relief granted under article 78 by the Supreme Court where general perspective into that type of proceeding is afforded (p. 258): “ a petition alleging arbitrary conduct should be dismissed where, as here, any reasonable explanation of the conduct can be found (24 Carmody-Wait, New York Practice 2d, § 145:318).”
*856 At the same time, holding that section 255 of the Family Court Act as amended was more extensive than article 78, it stated (p. 258): “ The needs of the two children in this proceeding are indeed real, and our society may not, through its several agencies, nonchalantly assert that there is no way to care for them ”.
The proceeding, the Fourth Department held (p. 258): “ should he remitted for an evidentary hearing to ascertain more particularly the needs of petitioner * * * and the actual services which respondents are able to provide for them, and to determine whether respondents or any of them are acting arbitrarily or capriciously in denying to petitioner * * * necessary available services.”
The proceeding was to be (p. 259); “transferred to the Family Court * * * wherein the hearing above described should be conducted, after which Family Court, in light of the facts adduced at such hearing, may solicit and order [emphasis added] such care, education and treatment of petitioner * * * as it may appear can appropriately be afforded ”.
At the same time that the Appellate Division held the powers of the Supreme Court limited, it remitted proceedings to the Family Court which it held to have more extensive powers under section 255 than those of the Supreme Court under article 78. It thus appears that the Second Department’s holding in Naima C. has been neutralized by a combined reading of the amended section 255 and Usen v. Sipprell (supra). We, therefore, respectfully consider Waima C. dated as of its time.
Procedures mandated in Usen v. Sipprell have been followed. This court offered on record to conduct the hearing mandated therein; was taken up on its offer; accepted the subsequent waiver of this hearing only upon admonition that it stood ready to extend it any time.prior to final order; and, despite the persistent waiver by the board of the proffered hearing, took the additional step of making available to it all materials considered on disposition.
Counsel for the board argues that it was the legislative intent to have the amended section 255 apply only in neglect and abuse proceedings under article. 10. If so, as pointed out by the Hon. J. George Follett in Matter of Edward M. (76 Misc 2d 781) this section which is painfully clear on its face, containing no construable ambiguity by which the legislative grant of power could be diluted, would have found its way into article 10 and not into article 2 dealing with the general powers of the court. The argument also ignores the actual facts. The legisla *857 tive intent emanates from the Select Committee on Child Abuse which first proposed this amendment. As summed up by its executive director, Professor Douglas J. Besharov, in a communication to Judge Follett (referred to in Edward M., p. 785) “ obviously, the possibilities are limited only by the types of cases that come before the Court and the legal responsibilities of agencies.”
Professor Besharov, comparing section 255 and article 78, and the possible argument that section 255 may not be as far reaching as article 78, stated: “ It seems to me that the language is somewhat broader than the traditional understanding of the writ of mandamus which generally refers to ministerial acts.”
It is particularly significant that the reversal in Matter of Naima C. (supra) was specifically based upon the fact that this court had in effect issued a writ of mandamus without statutory authorization to do so. This section now grants even wider powers than mandamus to this court.
It is the obvious legislative intent as thusly expressed and as confirmed in Usen v. Sipprell that section 255 applies even where this court will be placed in a position of substituting its discretion for that of the agency.
FINDINGS:
The court finds, on the facts, that the enrollment of Carlos at East New York Vocational High School is in his best interests; that it affords him the best opportunity to realize his potential as a useful member of society and break the vicious cycle which has trapped his parents and siblings; that the refusal of the board and the school to so enroll him is arbitrary, capricious and unreasonable. The court further finds, on the law, that the arguments of the board are without merit, for the reasons herein documented, and they are rejected categorically.
order:
The board of education, its agents, servants and/or employees, including but not limited to the principal of East New York Vocational High School, shall admit Carlos not later than 10 days after service of a copy of this decision and order by mail upon the board’s attorney of record, and personally or by registered mail upon the principal of the school in question. Failing compliance, the court serves notice that the principal has been before it personally and that it has already read, on record as required, the appropriate sections of the Judiciary Law and admonished of possible consequences Of failure to *858 comply. It will entertain appropriate proceedings upon expiration of the time set forth.
STAY:
Based upon assurances from attorneys for the board that an appeal will be taken herein so that all may be guided by a decision from the Appellate Division in this department, the court will stay all proceedings pending appeal, only upon proper assurance in writing or on the record prior to the expiration of the 10-day period, that proceedings to expedite this appeal in time for a decision prior to the commencement of the next school. term will be taken. The court reserves the right to vacate its stay unilaterally if it finds that proceedings to expedite the appeal are not going forward with due diligence. To make matters perfectly clear, the court does not intend to have another school year start and slip by while an appeal is pending without being diligently pursued.
In the alternative, if the board wishes to protect its position on appeal, the court suggests that it admit Carlos immediately, reserving to itself the right to act accordingly if the Appellate Division disagrees with this court’s position.
disposition :
Respondent is placed on probation in the older proceeding. As additional terms thereof, he is to co-operate with Sister Lillian’s efforts at rehabilitation and attend his new school, when enrolled, regularly. Judgment is suspended in the newer proceeding on condition of compliance with directives regarding probation.